## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **KYLE BEATTY,** | : | **CIVIL ACTION NO. 4:23-CV-364** |
| | : | |
| **Plaintiff** | : | **(Judge Neary)** |
| | : | |
| **v.** | : | |
| | : | |
| **CLINTON GARDNER and CALVIN** | : | |
| **IRVIN,** | : | |
| | : | |
| **Defendants** | : | |

### <u>MEMORANDUM</u>

Law enforcement officers have two key responsibilities. The first is to protect and defend the communities they serve from those who are alleged to have offended the law. And the second is to respect the legal protections afforded to these alleged offenders while the officers engage in their law enforcement duties. This case concerns the latter responsibility.

Plaintiff Kyle Beatty alleges seven constitutional and state law claims against defendants Officer Clinton Gardner and Detective Calvin Irvin resulting from the parties' interactions at a Williamsport gas station in August 2021. (Doc. 1). Defendants have moved for summary judgment on all claims. (Docs. 22, 26). The court will grant these motions insofar as they relate to Beatty's federal claims, decline to exercise supplemental jurisdiction over his state law claims, and dismiss those state law claims without prejudice.

## I.    <u>Factual Background & Procedural History</u>[1]

At issue here is whether Officer Gardner and Detective Irvin violated Beatty's constitutional rights and state tort law during the parties' encounter on August 31, 2021. That day, police saw Beatty and his girlfriend, Anaise Lopez, running errands in downtown Williamsport, Pennsylvania. (Doc. 25 ¶ 5). Beatty stopped at a Turkey Hill gas station to fuel up on gas and purchase food and drink; a police vehicle then parked near Lopez's Nissan Altima that Beatty had been driving. (<u>Id.</u> ¶¶ 1-2, 9-11). It is undisputed the police did not stop the vehicle. (<u>Id.</u> ¶ 10). Beatty and Lopez exited the Altima and went inside the gas station, leaving the driver's side window down. (<u>Id.</u> ¶ 12). Officer Gardner then walked over to the vehicle, looked inside the open window with a flashlight, and signaled for Detective Irvin to come to the vehicle. (<u>Id.</u> ¶ 15; Doc. 31-2 ("Detective Irvin 1") at 0:00:00-0:00:26).

What happened next is disputed by the parties. Defendants claim Officer Gardner "immediately detected the odor of marijuana coming from the Vehicle" and "observed a marijuana joint and marijuana flakes inside the vehicle," as did

---

[1] Local Rule 56.1 requires that a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 be supported "by a separate, short, and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried." M.D. Pa. L.R. 56.1. A party opposing a motion for summary judgment must file a separate statement of material facts, responding to the numbered paragraphs set forth in the moving party's statement and identifying genuine issues to be tried. <u>Id.</u> Unless otherwise noted, the factual background herein derives from the parties' Rule 56.1 statements of material facts. (<u>See</u> Docs. 25, 27, 31, 35). To the extent the parties' statements are undisputed or supported by uncontroverted record evidence, the court cites directly to the statements of material facts.

Detective Irvin (Doc. 25 ¶¶ 16-18; Doc. 25-3 ("Detective Irvin Dep.") at 12:1-5, 14:3-6; Doc. 25-5 ("Officer Gardner Dep.") at 13:18-14:21). Beatty denies the presence of marijuana or any "drugs or residue within the vehicle." (Doc. 31 ¶¶ 16). Officer Tyson Minier, who also was on the scene but is not a named defendant, testified that while he recalls Officer Gardner telling him that there was marijuana in the vehicle, he did not remember whether he saw any marijuana when he looked into the vehicle. (Doc. 31-8 at 9:15-23).

Turning back to what the record clearly reflects, Lopez exited the gas station and approached the defendants, inquiring about what was happening. (Doc. 27 ¶ 25g-h). Officer Gardner told Detective Irvin to "stay with her," and thereafter entered the gas station and patted Beatty down while Detective Irvin remained outside with Lopez. (Doc. 25 ¶ 21; Doc. 31-2 ("Officer Gardner 1") at 0:00:38-0:00:50). Before Officer Gardner searched Beatty, Beatty stated "Do you want to search me? Go ahead." (Officer Gardner 1 at 0:00:54-0:00:56). Officer Gardner escorted Beatty to the vehicle while telling Beatty to "come out and chat" and that he "just want[s] to talk about the roach and the weed in [Beatty's] car." (Officer Gardner 1 at 0:00:58-0:01:12). Meanwhile, Detective Irvin informed Lopez she was under investigation due to marijuana in the vehicle and she needed to walk to, and remain outside of, the car with Detective Irvin. (Doc. 27 ¶ 25h-i; Detective Irvin 1 at 0:00:40-0:01:20).

Once Officer Gardner returned with Beatty and rejoined Detective Irvin and Lopez around the Altima, Lopez stated there was no marijuana in the vehicle, and Officer Gardner responded there was a "roach in the cupholder" and "scraps of bud on the driver's floor." (Officer Gardner 1 at 0:01:24-0:01:34). Officer Gardner

instructed Beatty and Lopez that they could either consent to Officer Gardner searching the vehicle or Officer Gardner would tow the vehicle and apply for a search warrant. (Doc. 27 ¶ 25n). Beatty responded to Officer Gardner with "you can search it right now," and Lopez added "there's literally nothing in it." (Doc. 27 ¶ 25o). Before either defendant initiated a search of the vehicle, defendants asked Beatty and Lopez if they had any identification. (Officer Gardner 1 at 0:02:08-0:02:11). Detective Irvin then asked Beatty for his name, Beatty replied with "I'm not under arrest" and told Lopez not to let defendants search the vehicle, an instruction with which Lopez complied. (Id. at 0:02:12-0:02:18; Doc. 25 ¶ 24).

After Lopez revoked her consent, Officer Gardner proceeded to place Beatty in handcuffs with Detective Irvin's help, and defendants similarly restrained Lopez. (Detective Irvin 1 at 0:02:16-0:02:36). Officer Gardner claims there was "escalation in their demeanor . . . [s]o ultimately they were handcuffed" and that Beatty was antagonizing Lopez. (Officer Gardner Dep. at 19:13-20:8). Defendants told Lopez to stop as Lopez repeatedly and increasingly in volume requested a female officer, and defendants pressed Beatty's chest to have him sit on the hood of the vehicle. (Officer Gardner 1 at 0:02:48-0:03:40). Beatty said to defendants, "You're real tough;" Detective Irvin turned Beatty around, placed him face-down on the hood of Lopez's vehicle, and searched his pockets. (Id. at 0:03:40-0:04:00). Detective Irvin did not find any contraband on Beatty in this search. (Detective Irvin Dep. at 19:16-17).

After removing a phone and wallet from Beatty's pockets and while Lopez continued speaking loudly to Officer Gardner, Detective Irvin quietly conversed with Beatty about the marijuana and Beatty assured him that he could convince

Lopez to agree to a search of her vehicle. (Detective Irvin 1 at 0:03:51-0:04:08; Doc.

27 ¶ 25x). Lopez admitted that there was a marijuana roach from two days before in

the car. (Gardner 1 at 0:04:24-0:04:37). Detective Irvin escorted Beatty to the

backseat of the squad car and the two spoke as Detective Irvin stood outside the

open back door, where Beatty provided his first and last name and discussed

Lopez's behavior. (Detective Irvin 1 at 0:04:18-0:06:00; Doc. 27 ¶ 25z). Defendants

cannot pinpoint at what point in time backup assistance was called, but

Williamsport City Officer Zachary Geary arrived while Beatty and Detective Irvin

were talking at the squad car and assisted Officer Gardner with escorting Lopez

and placing her inside the backseat of another squad car. (Officer Gardner Dep. at

22:24-24:12; Officer Gardner 1 at 0:05:06-0:05:42).

Officer Gardner returned to inform Beatty that Lopez was under arrest for

aggravated assault; Beatty maintained that he and Lopez did not do anything to

warrant these events, and Detective Irvin replied that "with the marijuana and the

smell and the actual roach in the car, there was an investigation" during which

Beatty vehemently objected. (Detective Irvin 1 at 0:06:02-0:06:37). Williamsport City

Officer Tyson Minier arrived at the scene and defendants gave him their summary

of the situation at hand, as well as pointed him to look in Lopez's vehicle through

the window. (Doc. 27 ¶ 25jj; Doc. 31-2 ("Officer Gardner 2") at 0:00:34-0:01:11).

Officer Gardner opened the squad car door to Beatty, still handcuffed in the

backseat, and asked for his name. (Doc. 27 ¶ 25mm). Beatty did not offer his name to

Officer Gardner, reasoning defendants already possessed his identification, and

Officer Gardner told Beatty, "I'll arraign you as a John Doe. Until you decide to give

the court your name, you can sit in jail." (Id. ¶ 25nn-oo, rr). Detective Irvin retrieved

Beatty's driver's license from his wallet, ran Beatty's name and date of birth on

radio, discovered that Beatty's license is subject to ignition interlock restrictions,

and noted to Officer Gardner there is no ignition interlock in Lopez's vehicle. (Id. ¶

25uu-ww). Defendants returned to the squad car to discuss the incident and to

inform Beatty they would take him to City Hall once a tow arrived for Lopez's

vehicle, when Beatty explained that he is from Pennsylvania, but Lopez is from

Boston, Massachusetts and drove to Williamsport from there; he had warned her of

the difference in legality and treatment of marijuana between the two states. (Id. ¶

25xx-yy).

Officer Gardner drove Detective Irvin and Beatty from Turkey Hill to City

Hall and Detective Irvin brought Beatty into an interview room. (Doc. 27 ¶ 26;

Detective Irvin 2 at 0:00:00-0:00:15). Beatty and Detective Irvin remained in the

interview room together making casual conversation for approximately twelve

minutes before Officer Gardner joined, bearing latex gloves, and Detective Irvin

shut his bodycam off. (Id. at 0:00:15-0:12:30). Beatty was then strip-searched, which

he claims was without probable cause or reasonable suspicion and performed in

retaliation against protected speech activity. (Doc. 25 ¶ 42; Doc. 31 ¶ 43). Officer

Gardner contends the strip search was necessary and was justified by his

experience in the Narcotics Unit. (See Officer Gardner Dep. at 30:2-31:3).

Defendants did not find any contraband on Beatty's person as a result of this strip

search. (Doc. 25 ¶ 44).

Lopez was later charged in a three-count information of aggravated assault, simple assault, and harassment in the Court of Common Pleas of Lycoming County. (Doc. 25-7 at ECF 4). The government filed an amended information charging her with harassment and disorderly conduct. (Id. at ECF 5). During the bench trial, the court found "Officer Gardner's testimony to be credible" and found Lopez guilty of both offenses. (Doc. 25-12). Beatty was never charged with a criminal offense. (Doc. 25 ¶ 46).

Beatty sued Officer Gardner and Detective Irvin, raising the same seven claims in his complaint against both defendants. (Doc. 1 at 5-9). Four arise under 42 U.S.C. § 1983: (1) unreasonable arrest, (2) unreasonable stop, (3) unreasonable search, and (4) First Amendment retaliation. (Id. at 5-7). The remaining are Pennsylvania state law tort claims: (1) false arrest/false imprisonment, (2) battery, and (3) assault. (Id. at 8-9). Discovery has completed, and both defendants have moved for summary judgment. (Docs. 22, 26). These motions are fully briefed and are ripe for disposition. (Docs. 23, 30, 32, 34, 36, 40).

II.    **Legal Standard**

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment is appropriate if the moving party shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A factual dispute is material if resolution of it "might affect the outcome of the suit under the governing law" and genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Mall Chevrolet, Inc. v. General Motors LLC, 99 F.4th 622, 631 (3d Cir. 2024) (quoting

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). When considering a motion for summary judgment, a court must view the evidence in the light most favorable to the non-moving party. Tolan v. Cotton, 572 U.S. 650, 657 (2014) (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970)). The court's duty is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 242-43.

There are "two closely related methods for a movant to succeed at summary judgment." Mall Chevrolet, 99 F.4th at 630. "First, under the standard approach, the moving party may produce material facts, established as genuinely undisputed, that entitle it to judgment as a matter of law." Id. (citing FED. R. CIV. P. 56(a)). "Second, under the Celotex approach, a moving party may instead demonstrate that the nonmoving party has not made 'a showing sufficient to establish the existence of an element essential to that party's case *on which that party will bear the burden of proof at trial.*'" Id. (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)).

The nonmoving party can defeat a motion for summary judgment by producing evidence to establish a genuine issue of material fact. Anderson, 477 U.S. at 256. The nonmoving party "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." Id. The party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Anderson, 477

U.S. at 252. Moreover, if the nonmovant's version of disputed facts is "blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott v. Harris, 550 U.S. 372, 380 (2007).

**III.    Discussion**

Defendants move for summary judgment on all claims. First, they contend Lopez's state conviction stemming from the parties' encounter bars judgment against them in Beatty's civil case under Heck v. Humphrey, 512 U.S. 477 (1994). On the merits, defendants maintain they had probable cause to stop, search, and arrest Beatty, which negates his constitutional and state law tort claims. In the alternative, they contend qualified immunity shields them from judgment on the constitutional claims, and the Pennsylvania Political Subdivision Tort Claims Act ("PSTCA") immunizes them on the state law claims.

**A.  The Heck Doctrine Does Not Apply**

As a threshold matter, defendants claim Heck precludes all of Beatty's claims. (Doc. 23 at 2 n.1; Doc. 30 at 19-21). Since Lopez was convicted of criminal offenses stemming from the Turkey Hill incident and because the judge in those proceedings found Officer Gardner's testimony regarding observing marijuana to be credible, defendants contend that allowing the jury to make an adverse credibility determination would upset Lopez's state court conviction. Id. Not so.

Heck concerned a state prisoner challenging the constitutionality of his conviction in a Section 1983 action. Heck, 512 U.S. at 478. The prisoner alleged, among other things, law enforcement had "knowingly destroyed evidence which

was exculpatory in nature and could have proved [petitioner's] innocence[.]" Id. at 479 (internal quotation marks omitted). The Supreme Court held where "a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence . . . the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated." Id. at 487. Conversely, if "the plaintiff's action, even if successful, will *not* demonstrate the invalidity of any outstanding criminal judgment against the plaintiff, the action should be allowed to proceed[.]" Id. (emphasis in original).

Beatty's claims are not barred by Heck. He was not charged with, let alone convicted of, any offense stemming from the Turkey Hill incident. (Doc. 25 ¶ 36). And so, the state court judge made no findings regarding Officer Gardner's credibility with respect to Beatty. Heck stands for the proposition that persons cannot bring civil rights actions which would invalidate *their* criminal convictions, not convictions of others. Heck, 512 U.S. at 487 (prohibiting civil rights claim which would invalidate "any outstanding criminal judgment against the *plaintiff*") (emphasis added). Perhaps Lopez would be precluded from bringing claims against Officer Gardner and Detective Irvin under Heck, but Beatty is not.

### B. Probable Cause Existed, So Beatty's Constitutional Claims Fail

Section 1983 prohibits state and local officials, acting under color of law, from depriving persons "of any rights, privileges, or immunities secured by the Constitution and laws . . . ." 42 U.S.C. § 1983. As the Supreme Court has observed, this statute "creates no substantive rights; it merely provides remedies for deprivations of rights established elsewhere." City of Oklahoma v. Tuttle, 471 U.S.

808, 816 (1985). Therefore, a plaintiff seeking to establish a claim under Section 1983 "must demonstrate a violation of a right secured by the Constitution and the laws of the United States [and] that the alleged deprivation was committed by a person acting under color of state law." Moore v. Tartler, 986 F.2d 682, 685 (3d Cir. 1993).

Beatty's constitutional claims—unreasonable arrest, unreasonable stop, unreasonable search, and First Amendment retaliation—all hinge on whether defendants had probable cause or reasonable suspicion. As discussed below, the totality of the circumstances demonstrates beyond dispute that they did with respect to the arrest, stop, and two of the search claims, so these claims do not survive summary judgment, nor does the retaliation claim relating to these underlying claims. While the third search—Beatty's strip search—was not clearly supported by reasonable suspicion, qualified immunity shields defendants from judgment on this claim and the resultant retaliation claim. Thus, none of these claims survive summary judgment.

### 1. Unreasonable Arrest

A plaintiff asserting an unreasonable arrest claim "must establish '(1) that there was an arrest; and (2) that the arrest was made without probable cause.'" Harvard v. Cesnalis, 973 F.3d 190, 199 (3d Cir. 2020) (quoting James v. City of Wilkes-Barre, 700 F.3d 675, 680 (3d Cir. 2012)). Such a claim "will necessarily fail if probable cause existed for any one of the crimes charged against the arrestee[.]" Dempsey v. Bucknell Univ., 834 F.3d 457, 477 (3d Cir. 2016).

"Probable cause exists if there is a fair probability that the person committed the crime at issue." Wilson v. Russo, 212 F.3d 781, 789 (3d Cir. 2000) (quotation

marks and citation omitted). Law enforcement have probable cause to arrest an individual "when the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested." Orsatti v. N.J. State Police, 71 F.3d 480, 483 (3d Cir. 1995). This determination requires officers to "consider plainly exculpatory evidence in addition to inculpatory evidence . . . 'even if substantial inculpatory evidence (standing by itself) suggests that probable cause exists.'" Harvard, 973 F.3d at 200 (quoting Wilson, 212 F.3d at 790).

Courts evaluating probable cause at the summary judgment stage "must assess probable cause based upon the 'totality-of-the-circumstances' available to the arresting officer and view those circumstances in the light most favorable to" the plaintiff. Id. (citing Dempsey, 834 F.3d at 467-68). This requires comparing "whether the plainly exculpatory evidence available to the arresting officer" carries more weight than the probable cause that otherwise exists. Id. Because an assessment of probable cause is "necessarily fact-intensive," the factfinder at trial, rather than a judge at summary judgment, typically resolves this question. Dempsey, 834 F.3d at 468; see also Montgomery v. De Simone, 159 F.3d 120, 124 (3d Cir. 1998) (remarking "the question of probable cause in a section 1983 damage suit is one for the jury."). But summary judgment is appropriate where "a reasonable jury could not find a lack of probable cause" for the plaintiff's arrest. Id.

The parties dispute only whether probable cause existed for Beatty's arrest, not whether such arrest occurred. (Doc. 25 ¶ 30; Doc. 27 ¶ 25ii; Doc. 31 ¶ 25). Beatty

was never charged with committing any crimes. (Doc. 25 ¶ 46). Officer Gardner and Detective Irvin contend, however, that Officer Gardner's detection of a marijuana joint and flakes in the vehicle, coupled with the fact that the surrounding area was known for drug activity, established probable cause. (Docs. 23 at 7-9; 30 at 7-8). Beatty disputes both that he drove in a high narcotics trafficking area and that there was marijuana in the vehicle. (Doc. 31 ¶¶ 7, 16).

The record demonstrates defendants had probable cause to arrest Beatty. While footage from his body-worn camera is inconclusive, Officer Gardner provided uncontroverted testimony that he saw a marijuana roach and marijuana flakes in the vehicle. (Officer Gardner Dep. at 13:18-14:21). It is irrelevant that Beatty claims there was nothing illegal in the vehicle since he was not present and has offered no evidence whatsoever to counter Officer Gardner's eyewitness account. In fact, Officer Gardner's observations were bolstered by Lopez's later admission that there was a marijuana roach in the car. (Gardner 1 at 0:04:24-0:04:37).

Even assuming, for the sake of argument, the marijuana was medicinal in nature, it is illegal to possess medical marijuana in Pennsylvania in "dry leaf or plant form." 35 P.S. § 10231.303(b)(3); id. § 10231.304(b)(1) ("It is unlawful to . . . [s]moke medical marijuana."). Therefore, viewing the record in the light most favorable to Beatty, the totality of the circumstances makes evident there was a "fair probability" marijuana was in the vehicle. Harvard, 973 F.3d at 200; Wilson, 212 F.3d at 789. And because there was, defendants had probable cause to arrest Beatty. Orsatti, 71 F.3d at 483.

### 2. Unreasonable Stop

Beatty claims defendants unreasonably stopped him "in the complete absence of reasonable suspicion to believe that he was engaged in criminal conduct or was armed and dangerous." (Doc. 1 ¶ 40). Defendants maintain they had reasonable suspicion to stop Beatty for the same reasons they had probable cause to arrest him: among other things, Officer Gardner's observation of a marijuana joint and flakes in the vehicle, the fact that the surrounding area was known for drug activity, and Beatty's "not making eye contact and appearing unusually vigilant." (Docs. 23 at 7-9; 30 at 7-8).

Unreasonable stops offend the Fourth Amendment. United States v. Jackson, 120 F.4th 1210, 1218 (3d Cir. 2024); Terry v. Ohio, 392 U.S. 1, 9 (1968). An officer may conduct a stop after obtaining a warrant, or he may conduct a brief, investigatory stop absent a warrant if he has a reasonable, articulable suspicion of criminal activity. Jackson, 120 F.4th at 1218; Illinois v. Wardlow, 528 U.S. 119, 123 (2000). The reasonable suspicion required for a Terry stop is less than probable cause but requires an officer "to articulate more than an 'inchoate and unparticularized suspicion or hunch' of criminal activity." Wardlow, 528 U.S. at 123-24 (quoting Terry, 392 U.S. at 27).

The legality of Terry stop is a two-part inquiry. Jackson, 120 F.4th at 1218. At step one, courts consider if the stop was "justified at its inception—that is, whether the stop was supported by reasonable suspicion at the outset." United States v. Johnson, 592 F.3d 442, 452 (3d Cir. 2010) (internal quotation marks and citations omitted). Next, courts must determine "whether the manner in which the stop was

conducted was reasonably related in scope to the circumstances which justified the interference in the first place." Id. at 451, 452 (internal quotation marks and citations omitted).

Since they had probable cause to arrest Beatty, defendants necessarily bore a reasonable suspicion to stop him inside the Turkey Hill. Wardlow, 528 U.S. at 123-24. Beatty challenges the justification for this stop; he disputes whether he was driving in a high-crime area, avoiding eye contact with the officers, and the presence of marijuana in the vehicle. (Doc. 31 ¶¶ 6, 7, 16). True, merely driving in a high crime area alone does not provide reasonable suspicion of criminal activity. See Wardlow, 528 U.S. at 124 ("[I]t was not merely respondent's presence in an area of heavy narcotics trafficking that aroused the officers' suspicion, but his unprovoked flight upon noticing the police."). But, as noted above, Officer Gardner believed he saw marijuana in the vehicle and the forms of the marijuana—a joint and marijuana flakes—are prohibited by Pennsylvania law. (Officer Gardner Dep. at 13:18-14:21); 35 P.S. § 10231.303(b)(3); id. § 10231.304(b)(1). Therefore, as Officer Gardner bore a reasonable, articulable suspicion of criminal activity justifying the stop, defendants did not violate Beatty's Fourth Amendment rights in effectuating it.

### 3. Unreasonable Search

Beatty alleges Officer Gardner and Detective Irvin unreasonably searched him three times: (1) inside the Turkey Hill store; (2) on the hood of the vehicle; and (3) during the strip search conducted at the police station. (Doc. 1 ¶ 43).

Just like unreasonable stops, unreasonable searches violate the Fourth Amendment. United States v. Williams, 898 F.3d 323, 329 (3d Cir. 2018); Horton v. California, 496 U.S. 128, 133 (1990). Courts assessing the reasonableness of a search "have balanced the intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." Maryland v. Buie, 494 U.S. 325, 331 (1990). For example, a search incident to arrest is permissible "when, under all the circumstances, there remains a reasonable possibility that the arrestee could access a weapon or destructible evidence in the container or area being searched." United States v. Shakir, 616 F.3d 315, 321 (3d Cir. 2010).

As to the first search inside the Turkey Hill store, Beatty maintains he did not consent to a search, but that is "blatantly contradicted by the record." Scott, 550 U.S. at 380. Bodycam footage depicts Beatty stating "Do you want to search me? Go ahead." (Officer Gardner 1 at 0:00:54-0:00:56). His consent thus negates this unreasonable search claim. Williams, 898 F.3d at 329; Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973) (noting the validity of "a search that is conducted pursuant to consent."); Florida. v. Jimeno, 500 U.S. 248, 251 (1991) (assessing consent to a search under an objective reasonableness standard). Therefore, defendants are granted summary judgment as to this first unreasonable search claim.

The second search, on the hood of the vehicle after Beatty was arrested, also was permissible. It is axiomatic "that a search incident to a warrantless arrest is valid if the arrest itself is valid." United States v. Brown, 33 F. App'x 606, 608 (3d Cir. 2002) (citing United States v. Kithcart, 134 F.3d 529, 531 (3d Cir. 1998)); see also Beck v. Ohio, 379 U.S. 89, 91 (1964) ("The constitutional validity of the search . . . must depend on the constitutional validity of the . . . arrest."). Beatty's arrest was lawful as it was supported by probable cause, and thus the search incident to his arrest also was lawful.

Conversely, Beatty's strip search at the police station was arguably unlawful. "Undergoing such an inspection is undoubtedly humiliating and deeply offensive." Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington, 566 U.S. 318, 341 (2012) (Alito, J., concurring); see also Canedy v. Boardman, 16 F.3d 183, 185 (7th Cir. 1994) ("[O]ne of the clearest forms of degradation in Western Society is to strip a person of his clothes. The right to be free from strip searches and degrading body inspections is thus basic to the concept of privacy."). Precisely due to its invasiveness, a strip search must be supported by "reasonable suspicion of concealment of weapons or contraband." United States v. Parker, 458 F. Supp. 3d 260, 265 (M.D. Pa. 2020) (observing that neither the Supreme Court nor the Third Circuit have not directly addressed non-institutional strip searches and collecting cases from courts which have established this standard). "Reasonable suspicion could arise from the offense of arrest itself or from the particularized facts and circumstances known to the arresting officer." Id.

The record does not clearly demonstrate defendants bore such reasonable suspicion. For one, they already searched Beatty twice—once inside the Turkey Hill and another incident to his arrest—before they strip-searched him, neither of which uncovered weapons or contraband. (Officer Gardner 1 at 0:00:38-0:00:50); (Id. at 0:03:40-0:04:00); (Detective Irvin Dep. at 19:16-17). Second, by this point, defendants were aware both that the vehicle was owned by Lopez and that Lopez admitted the marijuana in the vehicle was hers as well. (Doc. 25 ¶¶ 1-2); (Gardner 1 at 0:04:24-0:04:37). Defendants merely support their decision to strip search Beatty with their past experience, rather than "particularized facts and circumstances" to Beatty which would bear a reasonable suspicion that he, rather than Lopez, had illicit materials on his person. Parker, 458 F. Supp. 3d at 265.

But while defendants may have violated Beatty's rights by subjecting him to a strip search, they are insulated from judgment by qualified immunity. This doctrine shields officers from Section 1983 liability unless they violate a right that was clearly established at the time the events transpired. Urda v. Sokso, No. 24-1804, __ F.4th __, 2025 WL 2046175, at *1 (3d Cir. July 22, 2025). Qualified immunity "protects all but the plainly incompetent or those who knowingly violate the law." Kisela v. Hughes, 584 U.S. 100, 104 (2018) (quoting White v. Pauly, 580 U.S. 73, 79 (2017)).

Beatty does not cite to caselaw clearly establishing that law enforcement, in the non-institutional setting, may not strip search an individual without reasonable suspicion of weapons and contraband. That is unsurprising, as this court previously observed neither the Supreme Court nor the Third Circuit directly addressed the

constitutional standards governing non-institutional strip searches. <u>Parker</u>, 458 F. Supp. 3d at 265. Because this right was not clearly established when defendants conducted the strip search, they are shielded from judgment for doing so by qualified immunity and will be granted summary judgment on this claim.

### 4. First Amendment Retaliation

Beatty's final constitutional claim is for First Amendment retaliation. He alleges defendants "retaliated against him for engaging in . . . protected activity by following him, harassing him, holding him against his will, laying hands on him multiple times, handcuffing, detaining, arresting, and searching him three separate times all in the complete absence of probable cause and reasonable suspicion." (Doc. 1 ¶ 46). The protected speech, according to Beatty, was his refusal to provide defendants with his identification and his instruction to Lopez to withdraw her consent to search the vehicle. (<u>Id.</u> ¶¶ 17-18).

The government generally may not retaliate against a person for engaging in constitutionally protected speech. <u>Nieves v. Bartlett</u>, 587 U.S. 391, 398 (2019) (citing <u>Hartman v. Moore</u>, 547 U.S. 250, 256 (2006)). A person whose First Amendment rights are violated in such fashion may seek judicial relief. <u>Id.</u> But to do so, the "plaintiff must establish a 'causal connection' between the government defendant's 'retaliatory animus' and the plaintiff's 'subsequent injury.'" <u>Id.</u> (quoting <u>Hartman</u>, 547 U.S. at 259). The animus must be the but-for cause of the First Amendment violation. <u>Id.</u>

This analysis turns on whether probable cause existed for the plaintiff's arrest. <u>Id.</u> at 404. If it did, "a retaliatory arrest claim fails." <u>Id.</u> As noted above,

defendants had probable cause to arrest Beatty. Therefore, this claim cannot survive summary judgment. Id. Nor can Beatty demonstrate a causal connection between his stop, search in the Turkey Hill, and search incident to his arrest with purported retaliatory animus because those actions also were lawful. Therefore, his First Amendment retaliation claim on these grounds fail, too.

Conversely, whether defendants' decision to strip-search Beatty was lawful is not clearly supported by the record. But even assuming it was not, and that Beatty could demonstrate a causal connection between his speech and his strip search, his retaliation claim still would be barred by qualified immunity. Put simply, if binding caselaw does not clearly establish the constitutional standard for engaging in a non-institutional strip search, then caselaw also does not clearly establish the right to be free from retaliation relating to such a strip search. Therefore, the court will grant summary judgment to defendants on this claim.

### C. The Court Declines To Exercise Supplemental Jurisdiction Over Beatty's State Law Claims

In addition to his federal constitutional claims, Beatty also alleges false arrest, assault, and battery claims under state law. Having granted defendants summary judgment on all federal claims, this court has the discretion to exercise supplemental jurisdiction over Beatty's state law claims. 28 U.S.C. § 1367(c)(3). The court will decline to exercise its discretion to resolve these claims because doing so is not unfair to the parties and does not unduly hinder judicial economy. Hedges v. Musco, 204 F.3d 109, 123 (3d Cir. 2000) ("where the claim over which the district court has original jurisdiction is dismissed before trial, the district court *must*

decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so.") (emphasis in original) (quoting <u>Borough of West Mifflin v. Lancaster</u>, 45 F.3d 780, 788 (3d Cir. 1995)); <u>see</u> <u>also</u> <u>Reiner v. Northumberland Cnty.</u>, 734 F. Supp. 3d 379, 390 (M.D. Pa. 2024) (declining to exercise supplemental jurisdiction where all federal claims had been dismissed); <u>Vorobyev v. Wolfe</u>, 638 F. Supp. 3d 410, 429 (M.D. Pa. 2022) (same). Therefore, Beatty's state law claims will be dismissed without prejudice.

**IV.    <u>Conclusion</u>**

Defendants move for summary judgment on all of Beatty's claims. (Docs. 22, 26). The court will grant these motions as they relate to Beatty's federal constitutional claims. The court will decline to exercise supplemental jurisdiction over Beatty's state law claims and will dismiss these claims without prejudice. An appropriate order shall issue.

/S/ KELI M. NEARY
Keli M. Neary
United States District Judge
Middle District of Pennsylvania

Dated:    August 29, 2025